IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **HARRY A. BOLDEN,** | |
| **Plaintiff,** | |
| **v.** | **Civil No. 1:21-cv-02295-JRR** |
| **CAEI, INC.** ***et al.,*** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendant Baltimore Gas and Electric Company's ("BGE") Motion for Summary Judgment.  (ECF No. 39; the "Motion.")  The parties' submissions have been reviewed and no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).  For the reasons set forth herein, the Motion will be granted.

## I.    BACKGROUND

On September 7, 2021, Plaintiff Harry Bolden filed his original complaint against Defendants CAEI and Exelon Business Services Company, LLC, ("Exelon"), alleging employment-related race- and sex-based discrimination and harassment, and retaliation by termination.[1]  (ECF No. 1.)  On February 25, 2022, Exelon filed a motion to dismiss, which was denied on May 9, 2022.  (ECF Nos. 11, 17, 18.)  On November 23, 2022, Plaintiff filed an Amended Complaint against CAEI and BGE.[2]  (ECF No. 37.)  The Amended Complaint sets forth three counts: (I) Discrimination/Disparate Treatment Based on Race and Sex – 42 U.S.C. §§

---

[1] Plaintiff served CAEI on December 14, 2021.  (ECF No. 6.)  To date, CAEI has not responded to the Complaint.

[2] Plaintiff substituted BGE for Exelon Business Services Company, LLC, as a Defendant on the basis that "Exelon and BGE are both fully owned subsidiaries of Exelon Corporation, and BGE is the appropriate defendant in this matter."  (ECF No. 37.)

2000e, *et seq.*; (II) Harassment Based on Race and Sex – 42 U.S.C. §§ 2000e, *et seq.*; and (III) Retaliation and Wrongful Termination – 42 U.S.C. §§ 2000e, *et seq.*   Plaintiff seeks: (i) compensatory and punitive damages; (ii) statutory pre-judgment interest; (iii) reasonable attorneys' fees; and (iv) any other this relief this court deems proper.  (ECF No. 34-1 at 7.)

On January 30, 2023, BGE filed the instant Motion.  (ECF No. 39.)  BGE argues it is entitled to summary judgment because: (1) Plaintiff did not exhaust his administrative remedies as to BGE; (2) the substantial identity exception to exhaustion does not apply; (3) BGE and CAEI are not joint employers; and (4) neither BGE nor CAEI engaged in unlawful discrimination, harassment, or retaliation.  *Id.* at 19, 24, 27.

## II.    UNDISPUTED MATERIAL FACTS

CAEI was a business that provided information and technology consulting and professional services.[3]  (Def.'s Mot., Raymond Hubbard Decl., Exhibit 2, ECF No. 39-4 ¶ 3.)  BGE is a gas and electric utility company.  (Def.'s Mot., Brian Andrews Decl., Exhibit 3, ECF No. 39-5 ¶ 3.)  CAEI and BGE had a contractual relationship.  (Hubbard Decl., ECF No. 39-4 ¶ 14; Andrews Decl., ECF No. 39-5 ¶ 6.)  Raymond Hubbard, CAEI's former Vice President of Operations, managed CAEI's customer account with BGE.  (Hubbard Decl., ECF No. 39-4 ¶ 5.)  Hubbard was also "responsible for managing BGE's Collections Strategy Pilot [] that focused on collecting outstanding funds due on gas and electric bills from BGE's customers."  *Id.*  Plaintiff worked as a billing specialist on BGE's Collections Strategy Pilot program in the financial solutions department.[4]  (Bolden Dep. 88:5-17, 87:12-88:14, 97:9-16; Hubbard Decl., ¶ 11.)

---

[3] CAEI went out of business in 2018.  (Hubbard Decl., ECF No. 39-4 ¶ 6.)
[4] The Collections Strategy Pilot program was expected to last three to six months.  (Bolden Dep. 87:15-21.)  However, Bolden worked in the financial solutions department program from September 12, 2014, until his termination in February 2016.  *Id.* at 101:17-121 and 140:19-21.

CAEI was headquartered at 9256 Bendix Road, Suite 102, Columbia, Maryland 21045. (Hubbard Decl., ECF No. 39-4 ¶ 8.)  Plaintiff went to CAEI's headquarters in Columbia, Maryland, where he applied for employment.  (Bolden Dep. 82:9-83:17.)  Subsequently, Kia Smoot, CAEI's Human Resources Director, interviewed Plaintiff for a job.  *Id.* at 82:7-22 and 84:19-21.  After interviewing with CAEI, Plaintiff then had a second round of interviews with BGE.  *Id.* at 85:13-19.  The interview with BGE was not at CAEI's office.  *Id.* at 83:18-20.  After the interviews, Smoot extended Plaintiff an offer to work in the financial solutions department program.  (Bolden Dep. 86:19-87:11.)  Plaintiff accepted the position with CAEI and worked as a billing specialist on BGE's Collections Strategy Pilot program in the financial solutions department.  (Bolden Dep. 88:5-17, 87:12-88:14, 97:9-16; Hubbard Decl., ¶ 11.)

CAEI had a role in operating BGE's financial solutions department program.  (Andrews Decl., ECF No. 39-5 ¶ 6.)  While BGE and CAEI had a contractual relationship, CAEI and BGE were separate and distinct entities.  (Hubbard Decl., ECF No. 39-4 ¶ 10.)  CAEI never jointly operated a facility with BGE.  *Id.* ¶ 9.  CAEI remained "the entity responsible for management of its own employees."  (Hubbard Decl., ECF No. 39-4 ¶ 14.)  CAEI was "responsible for hiring and firing its employees and providing day-to-day supervision of its employees . . . ."  *Id.* ¶ 15.  CAEI had its own Human Resources department and maintained CAEI employees' records, including Plaintiff's records.  *Id.* ¶ 18.  CAEI provided employees, including Plaintiff, with employment benefits and paid into both unemployment and workers' compensation insurance.  *Id.* ¶ 22.

At the outset of employment, all CAEI employees, including Plaintiff, were made aware of CAEI's contractual relationship with BGE and Exelon through the "Temporary Worker Agreement."  (Hubbard Decl., ECF No. 39-4 ¶ 14.)  CAEI provided Plaintiff with the Temporary

Worker Agreement on September 12, 2014.   (Def.'s Mot., Exhibit 4, ECF No. 39-6.)   The

Temporary Worker Agreement provided, in part:

> This Temporary Worker Agreement (the "Agreement") is made this 12 day of September, 2014 by and among Bolden, Harry, an individual ("Temporary Worker") and CAEI, INC. a MARYLAND CORPORATION, Temporary Worker's employer ("Employer").
>
> WHEREAS, Employer has contracted with PONTOON SOLUTIONS, a FLORIDA corporation ("Vendor"), for Employer to provide certain services, including work performed on a temporary basis by Temporary Worker, to Vendor's Customer (defined below); and
>
> WHEREAS, Vendor has contracted with Exelon Business Services Company, LLC, a Delaware limited liability company, on behalf of itself and its affiliates ("Customer"), for Vendor to provide certain services related to Customer's temporary workforce under a program managed by Vendor (the "Program"); and
>
> WHEREAS, Temporary Worker may be assigned by Employer, at Vendor's direction, to work for Customer on a temporary basis.
>
> NOW, THEREFORE, for good and valuable consideration, the parties agree as follows:
>
> 1. Temporary Worker.
> Temporary Worker may, in Vendor's sole discretion, be engaged to provide services to Customer through the Program as an employee of Employer and not as an employee of Customer. Temporary Worker shall perform all services or work under the Program to the satisfaction of Customer.
>
> Temporary Worker acknowledges and agrees that no employment relationship between Temporary Worker and Customer or between Temporary Worker and Vendor is created by this Agreement, the agreement between Vendor and Customer, or by Employer's agreement with Vendor. Temporary Worker acknowledges and agrees that he or she is not a third party beneficiary of the agreement between Vendor and Customer and hereby waives any such rights which may arise under such agreement between Vendor and Customer.

4

(Def.'s Mot., Exhibit 4, ECF No. 39-6.)  Plaintiff read the Temporary Worker Agreement and then signed it while at CAEI.  (Bolden Dep. 112:10-20.)

After Plaintiff accepted the position, he attended CAEI orientation with the team of CAEI employees in the financial solutions department program.  (Bolden Dep. 89:12-91:18.)  The orientation was conducted by Smoot and Hubbard.  *Id.* at 82:11 and 89:15-90:1.  Brian Andrews, BGE's Manager of Customer Care, was also at the orientation.  *Id.* at 89:6-11.  At orientation, CAEI employees, including Plaintiff, were provided CAEI's Employee Handbook.  (Bolden Dep. 93:3-6; Hubbard Decl., ECF No. 39-4 ¶ 20.)

During Plaintiff's time at CAEI, he had three site supervisors—Debra Chew, Tabitha Horn, and Angelique Watts.  (Bolden Dep. at 95:7-18.)  Plaintiff also had monthly evaluations, at which he received performance feedback from CAEI supervisors, including Chew, Horn, Watts, Hubbard, and BGE's Manager of Customer Care, Brian Andrews.  (Bolden Dep. 127:19-128:18; Andrews Decl., ECF No. 39-5 ¶ 5.)  In mid-2015, Watts became Plaintiff's direct supervisor.  (Bolden Dep. 132:1-3; Hubbard Decl., ECF No. 39-4 ¶ 23.)  Plaintiff alleges that Watts forced him "to perform menial and degrading tasks that were not demanded of other employees; these tasks included preparing and serving meals for the office staff."  (Amended Complaint, ECF No. 34-1 ¶ 12; Bolden Dep., 161:12-21, 168:1-173:1-8.)  On or about February 12, 2016, Hubbard terminated Plaintiff employment.[5]  (Bolden Dep., 219:17-20; Hubbard, Decl., ECF No. 39-4 ¶ 30.)

On October 17, 2016, Plaintiff filed a Charge of Discrimination against CAEI with the Maryland Commission on Civil Rights ("MCCR").[6]  (Def.'s Mot., Exhibit 8, ECF No. 39-10.)  During the investigation, MCCR conducted a fact-finding hearing with Bolden, Smoot, Hubbard,

---

[5] Plaintiff testified at deposition that Hubbard called him on the 12th (Bolden Dep. 219:17); Hubbard's affidavit states Plaintiff was terminated on or about February 11, 2016.  (Hubbard Decl., ECF No. 39-4 ¶ 30.)

[6] Charges of Discrimination filed with the MCCR are automatically cross-filed sent to the EEOC for dual or cross-filing purposes.

"Mr. Barnett" (whom Plaintiff identified as CAEI's CEO and President), and Otis Rease (Bolden's CAEI co-worker).  (Bolden Dep., 143:5-11.)  MCCR did not interview BGE Senior Supervisor Khadija Duncan.[7]  (Duncan Decl., ECF No. 39-14 ¶ 7.)

On February 17, 2016, Plaintiff and CAEI entered into a Pre-Determination Settlement Agreement to resolve the MCCR Charge.  (Bolden Dep., 199:4-15; Def.'s Mot., Exhibit 11, ECF No. 39-13.)  Thereafter, Plaintiff decided not to go forward with the Agreement and the MCCR investigation continued.  (Bolden Dep., 200:11-201:1.)  On September 23, 2020, MCCR issued its Written Finding.  (Def.'s Mot., Exhibit 13, ECF No. 39-15.)  On June 10, 2021, the EEOC issued Plaintiff a copy of the Notice of Right to Sue.  (Def.'s Mot., Exhibit 14, ECF No. 39-16.)

## III.    LEGAL STANDARD

### Federal Rule of Civil Procedure 56

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."

---

[7] Khadija Duncan's former name is Khadija Webster. (ECF No. 39-14 ¶ 1.)  The court will refer to Ms. Duncan by her current name.

*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).  Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

Further, in undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  Critically, on a Rule 56 motion, the court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.- Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies

BGE argues that it is entitled to summary judgment because Plaintiff did not exhaust his administrative remedies.  (ECF No. 39-1 at 18.)[8]

Title VII requires a plaintiff to exhaust administrative remedies prior to bringing suit in court. *See Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022) (citing 42 U.S.C. § 2000e-5(b), (f); 29 U.S.C. § 633a(d)) (explaining that "[i]t is well settled that before filing suit under Title VII or

---

[8] For consistency, the court cites to page numbers as they appear at the top of the page in ECF.

the ADEA, a plaintiff must exhaust [his] administrative remedies by bringing a charge with the EEOC"). Specifically, "[u]nder Title VII, a civil action may be brought after administrative proceedings have ended or conciliation attempts have failed only 'against the respondent named in the [administrative] charge.'" *Alvarado v. Bd. of Trustees of Montgomery Cmty. Coll.*, 848 F.2d 457, 458 (4th Cir. 1988) (quoting 42 U.S.C. § 2000e–5(f)(1)).

An EEOC charge serves two important purposes: (1) "it notifies the charged party of the asserted violation" and (2) "it brings the charged party before the EEOC and permits effectuation of the [Civil Rights] Act's primary goal, the securing of voluntary compliance with the law." *Dickey v. Greene*, 710 F.2d 1003, 1005 (4th Cir. 1983), *rev'd on other grounds*, 729 F.2d 957 (4th Cir. 1984); *see Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (noting that administrative exhaustion is to "ensure[] that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible"). The exhaustion requirement, therefore, is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). It "serves a vital function in the process of remedying an unlawful employment practice." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013).

"Clearly, an entity not named in the administrative charge, and not provided with notice of the charge or the proceedings, cannot participate in the administrative conciliation processes." *Marshall v. Anne Arundel Cnty., Md.*, No. SAG-18-0074, 2020 WL 1939712, at *5 (D. Md. Apr. 22, 2020). "Thus, in ordinary circumstances, subsequent suit can be brought only against the respondent named in the [administrative] charge." *Id.* (internal quotation marks omitted). "However, in light of the liberal construction afforded to EEOC charges, certain exceptions have been made to the naming requirement." *Id.*

8

In the instant case, it is undisputed that Plaintiff did not name BGE in his charge of discrimination with the MCCR and the EEOC. (Def.'s Mot., Exhibit 8, ECF No. 39-10; Def.'s Mot., Exhibit 10, ECF No. 39-12.) Accordingly, unless the substantial identity exception applies, Plaintiff may not bring suit against BGE.

**B.**     **Substantial Identity Test**

"Although the Fourth Circuit has not formally adopted the test, other Courts within the circuit have employed the substantial identity test to assess whether a civil action can fairly be brought against a defendant other than the one named in the EEOC charge." *Marshall,* 2020 WL 1939712, at *5. The substantial identity test requires analysis of four factors:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
>
> 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
>
> 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; [and]
>
> 4) whether the unnamed party had in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Vanguard Justice Soc'y Inc. v. Hughes*, 471 F. Supp. 670, 688 (D. Md. 1979) (quoting *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977)). "Of these four factors, the second and third are the most important as they are most reflective of the two-fold purpose of the naming requirement." *Crosten v. Kamauf*, 932 F. Supp. 676, 682 (D. Md. 1996).

### 1.    Factor One

The first factor, whether the role of the unnamed party could have been ascertained at the time of the filing of the EEOC complaint, weighs in favor of BGE.  *See Marshall*, 2020 WL 1939712, at *6 (concluding that the plaintiff "readily could have named the County in her EEOC charge as her employer, or as one of her employers, if she intended to assert a claim for discrimination against it" where the plaintiff knew the county had paid her salary and provided her benefits, and, by the time she filed her administrative charge, she had contacted the county regarding her allegations of discrimination).

Plaintiff testified at deposition that he physically went into CAEI to apply and interview, and then subsequently physically went to BGE to be interviewed by BGE employees.  (Bolden Dep. 82:2-9 and 83:1-6.)  Plaintiff explained that CAEI and BGE were in separate locations.  *Id.* at 83:13-22.  Plaintiff further testified that he applied for a position at BGE while he was employed at CAEI.  *Id.* at 203:6-204:20.  Indeed, in connection with his Charge of Discrimination, when asked by the intake officer what remedy he was seeking, Plaintiff advised: "I had only acted professionally in my time at CAEI & BGE; winning several awards for service and dedication . . . I therefore ask that the company, CAEI, be made aware[9] of this harmful mistake; that compensatory and punitive damages be granted for what I have indured [sic].  I also ask to be given back my former post."  (Def's Mot., Exhibit 15, ECF No. 39-17.)

Relying on his deposition, Plaintiff maintains that he thought BGE and CAEI were one and same company, and that he did not understand the Temporary Employment Agreement.  (ECF No. 45-1 at 9; citing Bolden Dep. 115:1-4, 116:12-15, 111:2-22, and 112:1-9.)  At his deposition, Plaintiff reviewed the Temporary Employment Agreement and testified:

---

[9] This exhibit is a photocopy of a hand-written intake notes in connection with Plaintiff's administrative Charge.  The photocopy cuts off minor portions of the document, including what the court believes is the word "aware."

Q. So looking at this agreement, CAEI is defined as your employer, correct?

A. Yes.

Q. And then it goes on to say that the employer has contracted with Pontoon Solutions, a Florida corporation defined as, in quotation marks, vendor, for employer to provide certain services, including work performed on a temporary basis by temporary worker to the vendor's customer. Do you see that?

A. Yes.

Q. Do you understand that Pontoon was a vendor to provide certain services to their customer?

A. Yes.

Q. Okay. And moving to the next paragraph, the agreement states that the vendor has contracted with Exelon Business Services Company. Then it's defined as the customer, in quotation marks. For vendor to provide certain services relating to customer's temporary workforce under a program managed by the vendor. Do you see all of that?

A. Yes.

Q. Okay. So do you understand that Exelon Business Services Company was Pontoon's customer?

A. I don't know the legal definitions or associations. But I didn't think of it in those terms.

Q. Okay. But you signed this agreement, correct?

A. Yes.

Q. Okay. So let's go down to paragraph 1, temporary worker. Did you read this agreement before you signed it?

A. Yes.

Q. Did anyone explain this agreement to you?

A. No.

11

Q. Did you sign it when you were at CAEI –

A. Yes.

Q. -- that day? Okay. Temporary worker, paragraph 2. Temporary worker, which is you?

A. Yes.

Q. Temporary worker acknowledges and agrees that no employment relationship between temporary worker and customer or between temporary worker and vendor is created by this agreement. The agreement between vendor and customer or by employer's agreement with vendor; do you see that?

A. Yes.

Q. Okay. And we just discussed who all of these -- what all of these terms mean, but you would agree that this provision -- in this provision you acknowledged that there was no employment agreement between you and Exelon, correct?

A. No. Because I'm doing service for Exelon in some way.

Q. Well, the language says: Temporary worker acknowledges and agrees that no employment relationship between temporary worker and customer is created by this agreement.

A. Give me one second just to read it.

Q. Sure.

A. Okay. Yeah, it's kind of confusing because it says temporary worker shall perform all services or work under the program to the satisfaction of the customer. So if you're performing work to the satisfaction of the customer, that would kind of assume a relationship between you, as an individual, and the customer, as an objective entity.

Q. So, Mr. Bolden, the question is, you signed this agreement, we've established, right?

A. Uh-huh.

(Bolden Dep. 111:4-114:11.)

With regard to whether BGE and CAEI were separate entities, Plaintiff testified:

> Q. . . . So when you signed this agreement, you were aware that Exelon Business Services was a separate entity from CAEI, correct?
>
> A. Correct.
>
> Q. Okay. And that BGE was a separate entity from CAEI, correct?
>
> A. No, I did not know that until Mr. -- I don't know. I thought it was all one company.
>
> Q. Did you ever receive any policies from BGE?
>
> A. Any policies from BG&E? No.
>
> Q. Written policies?
>
> A. Only -- I don't know that this is a policy, but they would reinforce the idea that safety was paramount to everything. Safety at BG&E was above and beyond anything that you do of any importance every day at work. And so they wanted you to work in the same fashion. That's the only thing they stressed every meeting pretty much was about --sorry.
>
> Q. Okay. So you testified earlier that, you know, all these -- your site supervisors were all employed by CAEI, that you and these 23 billing specialists were employed by CAEI, and then other people like Mr. Andrews and Ms. Webster were provided by BGE, correct?
>
> A. Yes.
>
> Q. Okay. So why would they be -- why would you say that they're all one company?
>
> A. In terms of BG&E and Exelon being two separate identities, I thought it was just a rose called by another name.
>
> Q. Oh, that BGE and Exelon are the same thing?

A. Yes.

Q. Okay. But you recognize that BGE and Exelon are separate from CAEI?

A. Now I do.

Q. Now you do?

A. Oh. I'm sorry. I said -- I knew that before. I thought that BGE and Exelon are separate from each other, I didn't know that. I thought they were the same.

Q. Okay. So let's clean this up just a little bit. I think we -- at least I got a little bit confused. So you understand that BGE and CAEI are separate companies?

A. Correct.

Q. Okay. And that Exelon and CAEI are separate companies, correct?

A. Now I do, yes.

Q. Okay. And you may or may not have known that BGE and Exelon are separate companies?

A. I'm sorry. I missed it. Can you once more -- can you just repeat?

Q. Okay. So you understand that BGE and CAEI are separate companies?

A. Yes. Yes.

Q. Okay. And you understand that Exelon and CAEI are separate companies?

A. Yes.

Q. Okay. You understand now that BGE and Exelon are separate companies?

A. Yes.

Q. Okay. But maybe in the past you didn't know?

14

A. Yes.

Q. Is that what you were talking about before?

A. Yes.

Q. Okay. I think we're clear on that then. So when you said I thought they were all one company, you were referring to BGE and Exelon being all one company?

A. Yes.

(Bolden Dep. 114:18-118:3.)

When looking at the broader framework and context of Plaintiff's testimony, Plaintiff admits that he knew BGE and CAEI were separate companies.  The confusion was not between BGE and CAEI; rather, Plaintiff was confused about whether Exelon and BGE were separate companies.  Plaintiff testified further that, at least by 2016, he knew BGE and CAEI were separate companies.  *Id.* 205:4-8.  Plaintiff fails to provide evidence to suggest that, at the time of filing his Charge of Discrimination, he could not reasonably ascertain the role of BGE.  Plaintiff fails to generate a genuine dispute of material fact as to factor one.

## 2. Factor Two

With regard to the second factor, BGE argues that it was necessary to name BGE in the Charge of Discrimination because its interests are dissimilar to those of CAEI.  (ECF No. 39-1 at 21.)  Plaintiff maintains there is a similarity of interest between BGE and CAEI because the MCCR's Written Findings include a reference to Kadijah Duncan, a manager at Exelon.  (ECF No. 45-1 at 9.)

For the second factor, courts consider the management, ownership, corporate officers, and interrelatedness of the parties.  *See Marshall*, 2020 WL 1939712, at *7 (noting that the named party and the unnamed party were entirely different and operated separate and distinct offices);

*EEOC v. 1618 Concepts, Inc.*, 432 F. Supp. 3d 595, 605 (M.D.N.C. 2020) (finding that the defendants are closely interrelated where: (1) "[t]hey share employees and have common ownership, management, and corporate officers;" (2) they "share a main office location, where employee files for all three [d]efendants are maintained;" and (3) they "share an email account and company vehicles"); *Mayes v. Moore*, 419 F. Supp. 2d 775, 783 (M.D.N.C. 2006) (explaining that the unnamed parties' interests are not similar when the defendants are separate business entities); *Tietgen v. Brown's Westminster Motors, Inc.*, 921 F. Supp. 1495, 1496 (E.D. Va. 1996) (finding that the statutory naming requirement was no bar to the plaintiff's claim because he alleged "substantial identity" including that the defendants were "under common control, including specifically that the same persons exercised control over employment decisions at both dealerships"); *Lindblad v. J&L Services, Inc.*, No. 4:18-cv-1336-RBH-TER, 2019 WL 653968, at *9 (D.S.C. Jan. 20, 2019) (noting that the second factor is not satisfied where the parties are "separate corporate entities").

The affidavit of Raymond Hubbard, CAEI's Vice President of Operations during Plaintiff's employment, provides:

> CAEI was headquartered at 9256 Bendix Road, Suite 102, Columbia, Maryland 21045. This location was never jointly operated by CAEI and either BGE and/or Exelon Business Services Company, LLC ("Exelon");
>
> CAEI never jointly operated a facility with BGE;
>
> CAEI is a separate and distinct entity from BGE, and it does not share any corporate or business identity with BGE;
>
> I have personal knowledge of the contracting process between BGE and CAEI. CAEI entered this contractual relationship with the intention that it would be the entity responsible for the management of its own employees; and

> BGE was not responsible for managing or supervising CAEI employees, and BGE did not exercise control over any CAEI employees' work conditions. CAEI was solely responsible for hiring and firing its employees and providing day-to-day supervision of its employees at the Collections Strategy Pilot, including disciplining its employees and promoting its employees to senior or lead positions. I interviewed Mr. Bolden in person and made the decision to hire him.

(Hubbard Decl., ECF No. 39-4 ¶¶ 8-10, 14-15.)

Plaintiff fails to address these factors and does not provide evidence that BGE and CAEI are so similar that it would have been unnecessary to name BGE in the Charge of Discrimination. Instead, Plaintiff makes reference to the court's memorandum opinion at ECF No. 17 and the MCCR Written Finding that includes Exelon Employee, Khadija Duncan. (ECF No. 45-1 at 9.) Plaintiff then argues "[e]vidence produced in records of the cases shows that allegations in the pleadings are substantiated [sic] denying Defendant's summary judgment as a matter of law." *Id.* It is unclear how the court's memorandum opinion and the MCCR Written Finding that references Duncan, taken together or separately, suggest a similarity of interest between BGE and CAEI of the sort required here. That notwithstanding, in the court's memorandum opinion at ECF No. 17, the court concluded that for purposes of the motion to dismiss only, it was plausible that Exelon (or BGE) was aware of the underlying Charge of Discrimination against CAEI because MCCR's Written Finding referenced Ms. Duncan and an investigation. Thus, the court allowed it to proceed because it was plausible that Ms. Duncan or Exelon Management was interviewed as part of the MCCR's underlying investigation. (Def.'s Mot., Exhibit 13, ECF No. 39-15.) Discovery, however, has demonstrated otherwise.

The affidavit of Khadija Duncan provides that she "was not interviewed by the MCCR in connection with Mr. Bolden's Charge of Discrimination against CAEI;" nor was Duncan aware of "Mr. Bolden's Charge of Discrimination against CAEI, filed with the Maryland Commission on

Civil Rights ('MCCR') until after Mr. Bolden filed the instant lawsuit in September 2021."
(Duncan Decl., ECF No. 39-14 ¶¶ 6-7.)  Further, Hubbard's affidavit provides that, "[t]o the best
of my knowledge, the MCCR did not interview anyone from Exelon or BGE during the course of
the investigation."  (Hubbard, Decl., ECF No. 39-4 ¶ 33.)

Plaintiff cites to no authority to suggest that MCCR's reference to Ms. Duncan implies that
BGE and CAEI's interests are so similar that naming BGE in the Charge of Discrimination was
unnecessary.  Accordingly, Plaintiff fails to generate a dispute of fact on this issue.

### 3.      Factor Three

With regard to factor three, BGE argues that it was prejudiced by not participating in the
underlying administrative proceeding.  (ECF No. 39-1 at 22.)  Relying on *Gamble v. Charles
County*, Plaintiff maintains that Defendant was not prejudiced by not participating because the
case was not resolved in the administrative proceeding.  (ECF No. 45-1 at 10; citing *Gamble v.
Charles County*, 2020 WL 3491823, 20-cv-3126-PWG (D. Md. Aug. 9, 2021)).

In *Gamble v. Charles County*, the plaintiff filed a complaint against the Charles County
Sheriff's Office, and stated that he did not think he also needed to name Charles County "because
he understood the Sheriff's Office to be a county agency."  2021 WL 3491823, at *2.  The *Gamble*
court noted that, while the plaintiff "may have been able to determine whether the Sheriff and
County are distinct entities, this is far from common knowledge, and doing so requires careful
analysis of multiple sections of the Maryland Code."  *Id.* at *10.  The court further concluded that
the County funds the Sheriff's office such that the two entities have similar interests.  *Id.*
Additionally, while the County argued that the Sheriff could not properly represent its interest, the
court explained, "the County fails to articulate how those interests significantly differ from the

Sheriff's." *Id.*   Finally, with regard to the third factor, which Plaintiff relies on here, the *Gamble*

court explained:

> As to prejudice, the EEOC filing did not result in an adverse finding
> against either the County or the Sheriff; it is wholly implausible that,
> had the County been named in the EEOC filing, it would have
> altered its course as to Mr. Gamble in the EEOC proceedings
> because the commission found that Mr. Gamble had not made out a
> statutory violation.

*Id.* at *10.   Accordingly, the *Gamble* court concluded that the plaintiff satisfied the substantial

identity test, and the facts did not warrant dismissal of the unnamed party.  2021 WL 3491823, at

*10.

The instant case, however, differs materially from *Gamble.*  In contrast to the *Gamble*

plaintiff, Plaintiff here filed discrimination charges with the MCCR.  Through the MCCR process,

BGE argues "it is unknown whether BGE's participation in the settlement discussions could have

resulted in a complete resolution of the matter." (ECF No. 48 at 9.)  It is undisputed that BGE did

not participate in the administrative proceedings.   It is also undisputed that, at the MCCR

proceedings, MCCR conducted a fact-finding conference at which Plaintiff and CAEI

employees—Hubbard, Smoot, and Barnett—participated; however, BGE (or Exelon) did not

participate.  (Andrews Decl., ECF No. 39-4 ¶ 32; Bolden Dep. at 143:5-144:9.)   Additionally,

Plaintiff and CAEI engaged in settlement discussions, and reached a settlement agreement that

Plaintiff signed and later repudiated.  (Pre-Determination Settlement Agreement, ECF No. 39-13;

Bolden Dep., 198:19-199:21.)  Further, contrary to *Gamble*, as discussed in Section I.A.1, *supra*,

Plaintiff was aware that BGE and CAEI were separate entities.  Plaintiff fails to show their interests

were so similar that naming BGE was unnecessary.

Plaintiff has failed to produce evidence that BGE would not be prejudiced by its absence in the administrative process.[10]  Rather, it is undisputed that BGE did not receive notice of the administrative action at all, including the MCCR fact-finding conference.  The court agrees with Defendant, therefore, that BGE "was deprived of notice and the opportunity to consider, through the conciliation process, whether the case could be resolved in a voluntary fashion."  *Marshall*, 2020 WL 1939712, at *8 (D. Md. Apr. 22, 2020); *see Phillips v. Goodwill Industries*, No. GLR-14-3256, 2015 WL 3844089, at *2 (D. Md. June 19, 2015) (noting that "the United States Court of Appeals for the Fourth Circuit has explained that notice to the employer of the alleged discrimination serves as a vital function in remedying an unlawful employment practice because it gives an employer the opportunity to independently investigate and resolve the alleged discriminatory actions") (citing *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013)); *Lindblad*, 2019 WL 653968, at *9 (concluding that the unnamed party "suffer[s] unfair prejudice by remaining a party to Plaintiffs' Title VII claims because it was not given the opportunity to respond to the administrative charges or participate in the EEOC's resolution and conciliation process").

### 4.   Factor Four

BGE argues that it did not represent to Plaintiff that their relationship would be through CAEI.  (ECF No. 39-1 at 23.)  Plaintiff counters that BGE's actions and inactions led him to believe that his relationship with BGE was through CAEI.  (ECF No. 45-1 at 10.)

While the relationship between BGE and CAEI may have been complicated to Plaintiff, it is undisputed that Plaintiff knew at the relevant time they were separate entities.  *See* Section I.A.1,

---

[10] To the extent Plaintiff suggests that BGE had notice of the MCCR investigation and/or fact-finding conference because MCCR referenced Ms. Duncan in its Fact-Finding Report, the court disagrees.  *See* Section I.A.2., *supra.* Further, it is undisputed that BGE did not receive notice of this matter until December 2021.  (Andrews Decl., ECF No. 39-5 ¶ 12.)

*supra.*  Plaintiff testified at deposition that he interviewed with CAEI and BGE at separate locations, he signed a CAEI Temporary Worker Agreement, and that he understood BGE and CAEI were separate entities.  *See* Section I.A.1, *supra.*  Indeed, Plaintiff applied for a position with BGE before his termination and discussed employment options at BGE with Mr. Andrews. (Bolden Dep. 235:8-11 and 236:17-19.)  Plaintiff fails to provide evidence to generate a dispute of fact as to whether BGE represented its relationship with Plaintiff would be through CAEI, such that filing a charge against CAEI also meant he was filing a charge against BGE.  That notwithstanding, the second and third factors, which weigh in BGE's favor, and "are the most important as they are most reflective of the two-fold purpose of the naming requirement." *Crosten*, 932 F. Supp. at 682.

In sum, Plaintiff has failed to generate evidence on which a reasonable juror could conclude that the substantial identity exception applies in this case.  Accordingly, by failing to name BGE in his MCCR and EEOC discrimination charge, Plaintiff failed to exhaust his administrative remedies.

### C.   <u>Joint Employer</u>

To the extent Plaintiff maintains that BGE is a "joint employer" such that BGE and CAEI may both be considered his employee, "[a] charge must be filed against each employer to pursue a claim against that employer."  *Phillips v. Goodwill Indus.*, No. GLR-14-3256, 2015 WL 3844089, at *2 (D. Md. June 19, 2015) (quoting EEOC Compliance Manual, § 2–III(B)(1)(a)(iii)(b)); *see Lindblad v. J&L Services, Inc.*, No. 4:18-cv-1336-RBH-TER, 2019 WL 653968, at *10 (D.S.C. Jan. 20, 2019) *report and recommendation adopted sub nom. Lindblad v. J&L Servs., Inc.*, No. 418CV01336RBHTER, 2019 WL 652248 (D.S.C. Feb. 15, 2019) (noting that district courts in the Fourth Circuit have held that even if a plaintiff advances a theory of "joint

employer, by which both entities may be considered" plaintiff's employer, such theory does not alter the requirement that "[an EEOC] charge must be filed against each employer to pursue a claim against that employer") (quoting *Phillips*, 2015 WL 3844089, at *2 (D. Md. June 19, 2015)). Accordingly, because Plaintiff failed to name BGE in his MCCR/EEOC charge, Plaintiff's joint employer theory fails.

## CONCLUSION

For the reasons set forth herein, by separate order, Defendant's Motion for Summary Judgment (ECF No. 39) is GRANTED.

/S/

_____
Julie R. Rubin
United States District Judge

September 12, 2023